PROVO STY, J.
The accused was tried for murder, and convicted of manslaughter, and sentenced to 10 years at hard labor.
A state witness havinig said on cross-ex amination that he had testified on two previous occasions, a first time in the district attorney’s private office, and a second time on the preliminary examination of the case, and that his testimony had been the same as now, and had been taken down in writing, counsel for accused orally in court called upon the district attorney to produce the testimony given in his private office. The district attorney would not do so, and the court refused to compel him, although counsel stated that the object was to impeach the witness by showing that the said testimony was different from that on the trial.
[1] If counsel, instead of saying in general terms that the said testimony was different, had recited it in an affidavit, or, at any rate, given the particulars of it under oath, thereby making proper showing, the question would have arisen whether the court can compel the prosecution to produce on the trial a material private document of which it has possession. But no such showing was made, and for the very good reason, as is manifest from the brief, that counsel did not know that said testimony had been different, and therefore were not in a position to make any such showing. So that in making said request counsel were merely on a fishing expedition.
“The courts uniformly decline to grant an application for production and inspection where it is merely for the purpose of a fishing examination.” 23 A. & E. E. of Law, 179.
[2, 3] Counsel say that said testimony was a public document, and that, therefore, they were entitled to access to it.
The document was not a public document; but even if it had been, and even if the ruling denying access to it had been erroneous, there would be no ground for reversal, because the document, even if produced and found to be conflicting with the testimony on the trial, would have been inadmissible in evidence; since the sole purpose for which it was wanted was for impeaching the witness, and it would have been inadmissible for that purpose, the proper foundation for its introduction in evidence for that purpose not having been laid by calling the attention of the witness to the particulars wherein the two statements were contradictory.
“Before the statements could be introduced for such purpose, it is essential, under the rule, that the substance of the contradictory matter should have been stated to the witness, and he should have been asked whether the statements had been made.” State v. Jones, 44 La. Ann 961, 11 South. 596.
[4] Bills of exceptions 2, 3, and 4 will be considered together. It was his own wife he was charged with having murdered. Some *525 six weeks previous to the homicide, they had separated. About two mouths before the homicide, she had lodged a complaint against him in the juvenile court for nonsupport of their minor child, and he had been condemned to pay $3 per week for the support of the child; and about a month after this judgment had been rendered, while she and her mother were visiting a neighbor, he had (as the witness expressed it) “come in the gate behind her, and flung the gate in, and put a box behind it, and run in and grabbed her, and asked her to come back to him, and told her that, if she did not want to come by good will, he would make her come by bad will.” Before the separation, they had occupied one side of a double cottage of which the parents of the wife occupied the other side. After the separation, the wife lived with her parents. On the afternoon of the 13th of June the father-in-law, while going to his house, and when about a square and a half from it, heard pistol shots, and presently saw “a lot of people” running to his house. He then began running, too. When he reached the street corner, he heard some more shots, and saw his wife run out of the house, screaming, with her hands up, and go through the gate of the house next door. On entering the front room, he saw his daughter stretched on the floor, dying or dead, and saw the accused in the third room with a pistol in his hand. Accused aimed the pistol at him. and he grabbed a water pitcher and hurled it at accused. The pistol snapped, but the -pitcher took effect on the side of the head of accused. One of the witnesses who, when the first shots were fired, was lying down reading in a house about half a block away, hastened to the spot on hearing the shots, and on the way passed the mother as she was running out of the house to the house next door, screaming. When he reached the house, the wife was dead, and the accused was fighting with his father-in-law, striking him on the head with the butt of the pistol.
The accused objected on the ground of irrelevancy to proof of the incident at the neighbor’s house when he told his wife that she would have to come to him by good will or else by bad will, and to proof of the proceedings in the juvenile court. The court admitted the proof as going to show intent.
The rulings we think correct.
“It is settled that the state had a right to prove a course of ill treatment and of quarrels with his wife on trial of the husband for her murder; also, that a complaint was filed against the defendant by the deceased, and was pending as tending to show motive and animus on the part of the defendant to kill the deceased. This testimony, while in and of itself inadmissible under the rule adverted to, yet, taken in connection with other relevant facts in the case, tends to establish the motive which actuated the defendant in his hostility towards the deceased, and for that reason is competent to be considered and weighed by the jury, in connection with the other testimony, in determining the question of motive, and, under some circumstances, in fixing the identity of the murderer.” 1 Wharton’s Cr. Ev. (10th Ed.) par. 43.
See, also, State v. Nix, 111 La. 812, 35 South 917; State v. Coleman, 111 La. 303, 35 South. 560; State v. Fontenot, 48 La. Ann. 306, 19 South. 111; State v. Birdwell, 36 La. Ann. 861; State v. Anderson, 45 La. Ann. 652;[1] State v. Johnson, 36 La. Ann. 853; State v. Goodson, 116 La. 389, 40 South. 771; Marr’s Crim. Jur. p. 68.
[5, 6] The accused objected to the proof of the fight with the father on the same ground of irrelevancy. The court admitted it to show intent, and also because this fight constituted practically one continuous transaction with the killing, and was therefore part of the res gestse.
These rulings also were correct. Marr’s Crim. Jur. p. 676; State v. Blount, 124 La. 202, 207, 50 South. 12, and cases cited; State v. Robinson, 112 La. 939, 36 South. 811.
[7-9] Bill of exception No. 5. On the same occasion on which he killed his wife *527 the accused shot his mother-in-law, and she died from the wounds three days later. Whether she made a dying declaration or not did not appear from the evidence. The counsel for accused was proceeding to argue to the jury that she had made such a declaration, and that it must have been unfavorable to the prosecution as otherwise the prosecution would have offered it in evidence, when, on objection made by the district attorney, the court stopped counsel, and said, in the presence of the jury, that no dying declaration had been made, and that, even if one had been made, it would not have been admissible in evidence. Counsel contend that these remarks of the judge constituted an illegal commenting on the facts by the judge; and that it was prejudicial because the line of defense was that the accused had killed his wife while firing on his mother-in-law, who was firing at him.
There is absolutely nothing in the record to sho'w that any evidence whatever was introduced on the trial to the effect that the mother-in-law fired at accused. The only mention of her having done so is contained in the affidavit for new trial. But the ruling was correct, even granting that the line of defense was as just stated, and that evidence was introduced to show that the mother-in-law fired upon the accused; for, there not having been any proof of a dying declaration having been made, counsel were traveling out of the record in stating that one had been made, and the judge may stop counsel from traveling out of the record Marr’s Crim. Jur. p. 772; State v. McCort, 23 La. Ann. 326. Moreover, the judge is not bound to allow counsel to misstate the law to the jury (12 Cyc. 584; State v. Menard, 110 La. 1098, 35 South. 360), and counsel were, in effect, doing so when they were basing an argument upon the nonproduetion in evidence of any dying declaration the mother-in-law might have made, since they were in effect telling them that such a dying declaration, if made, would have been admissible in evidence, whereas such is not the law; the rule admitting dying declarations being confined to the dying declaration of the person for whose killing the accused is being tried, the dying declaration of no other person being admissible (12 Cyc. p. 440 [c], 981 [b]), and this is so even where two persons are killed by the same act (10 A. & E. E. of Law, 373; 1 Whart. Crim. Ev. [10th Ed.] par. 280; State v. Wilson, 23 La. Ann. 558).
In the foregoing discussion of this hill No. 5 we have accepted the judge’s statement of the facts contained in his per curiam, and have disregarded the version of counsel as stated in the bill. But even ou the version of counsel the legal situation is not different. Counsel say that what they argued was that the mother-in-law had made no dying declaration, and that, if she had not been the aggressor, she would have made one. In the absence of evidence on the subject, counsel had no right to assert that no dying declaration had been made.
[10,11] The next bill of exception is to the judge’s charge on the degree of proof required for conviction and the weight to be attached to good character. The charge in that connection was as follows:
“Gentlemen of the jury, the prisoner at the bar is presumed to be innocent until he is proven guilty. The consequence of this rule of law is that he is not required to prove his innocence, but may rest upon the presumption in his favor until it is overthrown by positive, affirmative proof. The burden is, therefore, upon the state to prove to your satisfaction beyond any reasonable doubt the guilt of the prisoner as to the crime charged in the indictment, or any lesser one included in it. If you entertain any doubt as to any fact or element necessary to constitute the prisoner’s guilt, it is your sworn duty to give him the benefit of that doubt, and return a verdict of acquittal. And, even where the evidence demonstrates a probability of guilt, yet, if it does not establish it beyond reasonable doubt, you must acquit the prisoner. This doubt must be a reasonable one; that is, one founded upon *529 a real substantial basis, and not upon mere caprice, fancy, or conjecture. It must be such a doubt as -would give rise to a grave uncertainty, raised in your minds by reason of the unsatisfactory character of the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty as to the prisoner’s guilt. To put it differently, you must be satisfied of the prisoner’s guilt by that degree of assurance which induces a man of sound mind to act without doubt upon the conclusion to which it leads. If, after giving a fair and impartial consideration to the facts of the case, you find the evidence unsatisfactory upon any one single point indispensably necessary to constitute the prisoner’s guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty.
“You are prohibited by law and your oath from going beyond the evidence to seek for doubts upon which to acquit the prisoner, but must confine yourselves strictly to a dispassionate consideration of the testimony given upon the trial. You must not resort to extraneous facts or circumstances in reaching your verdict.
“The general reputation of the accused for peace and quiet is competent evidence, and it is to be considered by the jury together with all the other facts and circumstances of the case. The general reputation of a man is the opinion held of the party by persons in the community, and who live in his neighborhood or vicinity. It is not the personal opinion of the witness as to his character, but the opinion of the public as to his character. When his good reputation for peace and quiet has been established, then the presumption of law is the crime charged in the indictment is inconsistent with his former life and character, and the jury should give him the benefit of that presumption. A man’s good character may sometimes generate a reasonable doubt as to the defendant’s guilt, when no such doubt would have existed but for such good character; but, when a man’s guilt has been established beyond reasonable doubt, then the question of his character cannot avail the accused, and the jury should find him guilty.”
Counsel argue that good, character is to he considered in all cases, even in those which are not doubtful, and that this charge restricts the influence of good character to doubtful cases.
We think that any one reading this charge as a whole will understand it to mean that good character is to be considered in all cases, and not merely in cases which are doubtful even without proof of good character. The clause, “a man’s good character may sometimes cause a reasonable doubt as to defendant’s guilt, when no such doubt would have existed, but for such good character,” can have but one meaning, and that is that good character may justify acquittal in cases where without it there would have to be a conviction; or, in other words, in a ease where without proof of good character the guilt of the accused would have been made out beyond a reasonable doubt. And -the accused is not entitled to any more than this. The added clause, “but, when a man’s guilt is established beyond a reasonacter. The clause, “a man’s good character cannot avail the accused, and the jury should find him guilty,” must, and in the light of what precedes it in the sentence can only, be understood as meaning that good character cannot avail when, even after having taken good character into consideration, the jury are satisfied beyond a reasonable doubt of the guilt of the prisoner.
To attribute to this clause any other meaning than this would bring it into direct and violent conflict with the clause immediately preceding it in the sentence. It would be making the judge charge that good character can never be of any utility, since it can be of any utility only where in the absence of it guilt is established beyond a reasonable doubt; the accused being entitled to an acquittal in cases where guilt is not proven beyond a reasonable doubt no matter how bad his character may be.
What the judge meant to say, and, taking the charge as a whole, cannot but be understood as having said, is that good character may raise a doubt in cases which would otherwise be established beyond a reasonable doubt, but that it cannot avail in cases which, even after it has been taken into consideration, are not open to doubt. While hypercritically speaking the language is faulty or inartistic, the meaning is clear I enough. The judge not only may, but *531 should, qualify his charge on good character by impressing on the jury that character cannot avail in a case where after it has been taken into consideration there still remains no reasonable doubt, or, in other words, where the proof is plain, clear, and manifest, or, to use the expression of this court in the case of State v. Riculfi, 35 La. Ann. 770, “conclusive,” or, as said in State v. Nicholls, 50 La. Ann. 708, 23 South. 980, “positive.”
[12] The next bill is to that part of the judge’s charge bearing on self-defense, which is as follows:
“If a person is assaulted, but not in such a way as to endanger his life or to threaten him with great bodily harm, he may oppose force with force, and use such force as is necessary to repel the assault, but no more; and if, in the conflict which ensues, his adversary threatens to kill him or to inflict groat bodily harm upon him, he may then kill his adversary in defense of his own person. But a conflict not apparently endangering life nor threatening great bodily harm will not justify or excuse the killing of his assailant. If he should kill under such circumstances, he would be guilty of manslaughter at least. To justify the .killing, it must appear that his life was in danger, or that his person was in danger of receiving great bodily harm, and the circumstances must be such as would lead a reasonable person to that conclusion. In such circumstances, it is not necessary that he should have been in actual danger of losing his life, or of receiving great bodily harm, but there should exist a reasonable' appearance of danger, and he must have believed from the circumstances surrounding him that his life was in danger, or that his person was in danger of receiving great bodily harm, although such danger did not actually exist, apd the circumstances guiding him in his conclusion as to his danger must have been reasonable, and such as would lead a reasonable person to such a conclusion. It is not enough that he should have believed himself in danger, but the facts and circumstances must have been such that the jury can say that he had reasonable ground for such belief.
“In determining whether the circumstances were such as to make his belief reasonable, the jury should take into consideration the excitement and confusion, if any existed, which would naturally result at such a time. It would be unjust to require the defendant in such circumstances to possess the same circumspection and cool and deliberate judgment in estimating danger, or the choice of means of repelling it, as we who are unaffected by the excitement or danger, if any existed, may now exercise in contemplating it, and it would be to ignore the law of our being and to require a degree of perfection to which we have not attained. Of the weight the jury should give to these considerations no safer guard can be found than their own judgment, based upon all the circumstances then existing, and the consideration of what they, with an honest intent of avoiding danger, without necessarily taking life, might have done. In cases of sudden affray or conflict a homicide is not excusable on the ground of self-defense, unless the accused retreats as far as he safely can in order to avoid the violence of the deceased, and the necessity of taking his life. If he fails to do this, the homicide would be manslaughter at least. If the assault is so fierce as to endanger his life or his person by retreating, and his only safety is to kill his adversary, this he may do in defense of his own person. But if a man who is not at fault is suddenly assaulted by another, who intends to kill him or to inflict on him great bodily harm, he is not bound to retreat at all, but he may stand his ground and kill his assailant if there is reasonable, apparent necessity for so doing to save his life or to protect his person.
“But if a person commits an assault upon another, or provokes a difficulty, and thereby brings on a conflict, he cannot justify the killing of a person thus, assaulted or provoked, unless he satisfies the jury that he withdrew from the conflict brought on by himself. His withdrawal from the conflict must be in good faith, and in such an unequivocal manner as to show his adversary that he desires to withdraw. If then the party provoked or assaulted follows him, or attempts to kill him, or to do him great bodily harm, he acquires the same right of self-defense as if he had not been the original aggressor.”
Counsel say that this charge “tended to confuse the jury, and is not the law of self-defense,” and that “it limits the right of self-defense, whereas, we contend, actual and real danger is not indispensable to justify the killing in self-defense, but the true test is whether the prisoner at the time had reasonable ground to believe himself in danger,” etc.
We do not see why this very full and lucid charge should be said to have tended to confuse the jury; and it does not say that the danger has to be actual and real, but expressly says that it need exist only in appearance.
Judgment affirmed.

 12 South. 737.